## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Unison Co., Ltd.,

              Plaintiff,

     v.

Juhl Energy Development, Inc.,
Juhl Energy, Inc., Winona Wind
Holdings, LLC, Winona County
Wind, LLC, Daniel Juhl, John
Mitola, John Brand, Bartly J.
Loethen, Audrey Loethen, and Jeff
Bendel,

              Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-3342 ADM/JJK

_____

Boyoon Choi, Esq., and Vanessa M. Ish, Esq., Choi Capital Law PLLC, Seattle, WA; Paul R. Dieseth, Esq., and Katherine N. Arnold, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of Plaintiff.

J. Matthew Berner, Esq., and Tim L. Droel, Esq., Droel PLLC, Bloomington, MN, on behalf of Defendants.

_____

## I. INTRODUCTION

On March 7, 2014, the undersigned United States District Judge heard oral argument on Defendants' Motion to Compel Arbitration and Dismiss [Docket No. 24]. Plaintiff Unison Co. Ltd. ("Unison") opposes the motion. For the reasons set forth below, Defendants' motion is denied.

## II. BACKGROUND

Unison is a South Korean company that manufactures, sells, delivers, and services Wind Turbine Generators ("WTG"). Am. Compl. [Docket No. 14] ¶¶ 1, 4. Unison sold two WTGs to Defendant Juhl Energy Development, Inc. ("JEDI"). Id. ¶ 1. The parties entered into a series of

agreements: a Development Agreement in 2008, and then in April 2010, a Turbine Supply

Agreement ("TSA"), a Financing Agreement, a Security Agreement, and a Secured Promissory

note.  Id. ¶¶ 18-22.

> Unison claims:
>
> (1)     Count 1: Juhl Energy, Inc. ("JEI"), JEDI, Daniel Juhl, John Brand, and John
>
> Mitola fraudulently induced Unison to enter into the Financing Agreement;
>
> (2)     Counts 2-7: JEDI breached the Financing Agreement,
>
> (3)     Counts 8-11: JEI, Winona County Wind, LLC ("WCW"), Winona Wind
>
> Holdings, LLC ("WWH"), Bartly J. Loethen, Audrey Loethen, and Jeff Bendel
>
> caused JEDI to breach the Financing Agreement by tortiously interfering with its
>
> performance; and
>
> (4)     Count 12-16: JEI, WCW, WWH, the Loethens, and Bendel have been unjustly
>
> enriched.

See id.

Unison claims Defendants falsely represented the Winona County Economic

Development Authority (WCEDA), a public body established by Winona County, would remain

the long-term owner of the wind farm to which the WTGs were delivered.  Id. ¶ 26.  WCEDA's

continued ownership of the wind farm was important to Unison because Unison's loan to JEDI

was to be repaid as soon as WCEDA obtained either permanent debt financing or equity

involvement by another company.  If WCEDA sold the wind farm, Unison claims, permanent

debt financing and equity involvement would become far more difficult to obtain, making

prompt repayment to Unison unlikely.

The only question raised by this Motion is whether the TSA's arbitration clause allows

Defendants to force Unison to arbitrate this dispute.

JEDI and Unison agreed to the terms of the TSA, effective April 16, 2010.  The TSA

states:

> Section 3.4: <u>Equipment Financing</u>
> Unison understands that [JEDI] is to perform development and related services with respect to certain Projects which are utilizing the WTGs.  In connection therewith, the following outlines the proposal by Unison to provide financing with respect to the acquisition of the WTGs; all on the following principal terms and conditions: . . .
>
> • Unison understands Purchaser has arranged for a sale of the WTGs to an end user, and Purchaser shall commence construction of the project.  **Purchaser shall work to assist the project owners to secure equity investment and end loan financing for the project.**  It is understood that during the construction phase of the project that Purchaser shall receive a note payable from project owners.  Purchaser shall receive a first priority interest in the balance of plant assets and turbines from the owners, which shall be secured and evidenced by a filed UCC-1 financing statement.  Upon receipt of equity investment or end loan financing, Purchaser shall be paid in respect of the note the amounts due to it and Purchaser shall repay the amount it receives to Unison for the turbines until such time as Unison is repaid in full.  Unison shall also share in any available proceeds from the United States Department of Treasury grant in respect of the project, as the grant proceeds shall go to repay Purchaser and its subcontractors for completing the balance of plant work first, with any remainder paid to Unison. . . .  Purchaser shall fully cooperate with Unison and shall use all commercially reasonable efforts to obtain "Take-out" financing for the projects in order to fully repay Unison. . . .
>
> • **The financing documents shall be prepared and negotiated on or before April 16th, 2010, and this Agreement shall be contingent upon finalizing such documents on or before said date.**

> Section 16.1: <u>Negotiation of Disputes</u>.  The Parties agree that **in the event any dispute arises between them under or in connection with this Agreement or any legal relationship associated with or contemplated by this Agreement** (the "Dispute"), the Parties shall first promptly make all reasonable efforts to resolve the Dispute by amicable negotiations . . . .

> Section 16.2: <u>Arbitration</u>.  If the Parties fail to resolve the Dispute within 21 days pursuant to Section 16.1 (or any such longer period as Parties may mutually agree

to in writing), then **either Party may submit the Dispute for binding arbitration** by delivering to the other Party a written notice . . . .

Section 18.3: <u>Conflicting Provisions</u>.  In the event of any inconsistencies between this Agreement and any related documents:

    (a)    <u>Order of Precedence</u>.  The following order of precedence in the interpretation hereof or resolution of such conflict hereunder shall prevail:

        (i)    duly agreed upon Change Orders and written amendments to this Agreement executed by both Parties;

        (ii)    this Agreement;

        (iii)    the Exhibits hereto;

        (iv)    any drawings produced and delivered pursuant hereto (in respect of which precedence shall be given to drawings of a larger scale over those of smaller scale, figured dimensions on the drawings shall control over scaled dimensions, and noted materials shall control over undimensioned graphic indications).

Section 20: <u>Definitions</u>.  "<u>Agreement</u>" shall mean this Turbine Supply Agreement, and all exhibits, as amended from time to time in accordance with this Agreement.

Am. Compl. Ex. A (emphasis added).

The Financing Agreement, dated April 14, 2010, states:

Section 10.8:  <u>Submission to Jurisdiction; Service of Process</u>

    (a)    Borrower hereby **submits** to the jurisdiction of courts of the State of Minnesota in the County of Hennepin and of the United States for the Western[sic] District of Minnesota for any legal action or proceeding brought against it in connection with this Agreement and any other Financing Document.  By execution and delivery of this Agreement, Borrower hereby **irrevocably accepts** for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. . . .

Am. Compl. Ex. B (emphasis added).

## III.  DISCUSSION

The primary goal of contract interpretation is to determine and enforce the intent of the parties.  Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 323 (Minn. 2003).  Contract language "must be given its plain and ordinary meaning and will be enforced by the courts even if the results are harsh."  Bank Midwest, Minn., Iowa, N.A. v. Lipetzky, 674 N.W.2d 176, 179 (Minn. 2004) (quoting Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346-47 (Minn. 2003) (quotation omitted)).  The meaning of terms is determined within the context of the document as a whole and not in isolation.  Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp., 279 N.W.2d 349, 354 (Minn. 1979).  Accordingly, the contract is construed as a whole and the Court attempts to harmonize all clauses of the contract.  Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 525 (Minn. 1990) (citing Telex Corp. v. Data Prods. Corp., 271 Minn. 288, 293 (1965)).  In a transaction where the execution of one contract depends upon the execution of other contracts—in this case executing the TSA hinged on the execution of the Financing Agreement—the contracts must be interpreted collectively.  Dakota Gasification Co. v. Natural Gas Pipeline Co. of Am., 964 F.2d 732, 734 (8th Cir. 1992).

The Court must determine whether the parties have agreed to submit a dispute to arbitration.  If so, the Federal Arbitration Act directs the Court to compel arbitration and either dismiss or stay this action.  9 U.S.C. §§ 1 et seq. ("FAA" or "Act").  The FAA provides that written agreements to arbitrate are "valid, irrevocable and enforceable" as any contract would be. 9 U.S.C. § 2.  The Act reflects a "federal policy favoring arbitration," requiring that courts "rigorously enforce agreements to arbitrate."  Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987) (internal quotations omitted).  "A court's role under the FAA is therefore limited

to determining (1) whether a valid agreement to arbitrate exists, and, if it does, (2) whether the agreement encompasses the dispute." See Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003); Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 871 (8th Cir. 2004).

The parties do not dispute that a valid agreement to arbitrate exists in the TSA. They disagree about the scope of the arbitration agreement and whether it also applies to the Financing Agreement. To determine the scope of the arbitration agreement, the Court must first determine if the agreement is broad or narrow. Fleet Tire Serv. v. Oliver Rubber Co., 118 F.3d 619, 621 (8th Cir. 1997) (adopting the Second Circuit's inquiry in Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 63 (2nd Cir. 1983)). If the clause is narrow, the second determination is whether the dispute involves an agreement collateral to the agreement containing the arbitration clause. Id.; see also USW, AFL-CIO-CLC v. Duluth Clinic, Ltd., 413 F.3d 786, 789 (8th Cir. 2005).

The TSA arbitration clause is narrow. The parties agreed that "in the event any dispute arises between them under or in connection with this Agreement or any legal relationship associated with or contemplated by this Agreement," the Parties would make reasonable efforts to resolve the dispute with amicable negotiations. TSA § 16.1. Failing that, either party "may submit" the dispute for binding arbitration. TSA § 16.2.

Defendants argue the language of the arbitration clause broadly covers the TSA and all other collateral agreements between the parties. Defendants argue the TSA explicitly contemplates its status as the governing document for the entire wind turbine transaction, including the Financing Agreement; therefore, the TSA's arbitration clause covers disputes arising out of the Financing Agreement and is mandatory now that Defendants have invoked it.

6

But, these contentions are not in harmony with the contract as a whole and ignore the plain language of Section 10.8 of the Financing Agreement.  The Financing Agreement submits the parties to the jurisdiction of the courts of Minnesota for "any legal action or proceeding brought against it in connection with this [Financing] Agreement . . ." and the Defendant borrowers "irrevocably accept" the jurisdiction of these courts.  The TSA arbitration agreement cannot be broadly construed because it would render the Financing Agreement language a nullity.

The Court next examines "whether the dispute involves an agreement collateral to the agreement containing the arbitration clause."  Fleet, 118 F.3d at 621 (applying Prudential, 704 F.2d at 64).  In examining whether the conflicting agreements are "collateral," the important determination is once again the appropriateness of using arbitration given how the contract or contracts are structured.[1]  See Prudential, 704 F.2d at 64 (discussing the difference between a contract with an arbitration clause being terminated by its own terms versus a separate, collateral agreement to terminate the contract with the arbitration clause; the former, arbitrable, and the latter, not).  In Dakota Gasification, the Eighth Circuit found under the facts of that case executing a purchase agreement was contingent on a guarantee of financing; therefore, even though the purchase agreement included an arbitration clause, the financing agreement's litigation clause rights took precedence.  964 F.2d at 734-35.  In essence, the arbitration clause in the purchase agreement was collateral to the financing agreement's litigation clause, therefore, allowing the plaintiffs to exercise their litigation rights was appropriate.

---

[1] The word "collateral" has multiple definitions that could lead to confusion.  The Court uses "collateral" in the sense of "parallel, coordinate, or corresponding in position"; not in the sense of "accompanying as secondary or subordinate."  Merriam-Webster Dictionary (2014), available at  http://www.merriam-webster.com/dictionary/collateral.

In this case, the TSA and the Financing Agreement, read together, provide different means of resolving disputes.  For financing disputes, the Financing Agreement's litigation rights are more appropriate than the collateral TSA's arbitration clause.  The parties made the TSA contingent on the Financing Agreement.  For the TSA to take effect on April 16, 2010, the Financing Agreement needed to be prepared and negotiated.  This suggests that the Financing Agreement was a separate and independent negotiation from the TSA, and is not subsumed under the TSA contract.  In addition, the plain language of the separate agreements shows the parties viewed financing of the WTGs differently than the manufacture, design, and construction of the WTGs.  The TSA's arbitration clause is permissive—the parties "may submit" disputes, which are not amicably resolved, to arbitration.[2]  In contrast, the Financing Agreement's jurisdiction clause has clear mandatory language—"submits," "irrevocably," and "unconditionally."  The TSA emphasizes amicable negotiation and then resolves disputes through arbitration if one of the parties elects it.  The Financing Agreement makes clear that disputes about financing will be resolved through litigation.  If the parties intended arbitration for Financing Agreement disputes, the TSA would have explicitly said so.  Since all of Unison's claims arise out of the Financing Agreement, this dispute should be governed by Section 10.8 of the Financing Agreement, not by TSA's arbitration clause.

---

[2]   Defendants argue that the TSA's Conflicting Provisions clause covers the Financing Agreement.  However, the Conflicting Provisions clause is limited to the TSA itself.  The TSA defines "Agreement" as the TSA alone; it does not address collateral agreements.  When the parties set the order of precedence for the TSA Conflicting Provisions clause, the order of priorities rank 1) amendments to the TSA, 2) the plain language of the TSA, 3) exhibits, and 4) drawings.  TSA, Section 18.3.  None of these items covers the Financing Agreement, indicating this agreement is outside the scope of the TSA's arbitration clause.  The TSA simply resolves conflicting interpretations among TSA related documents, such as exhibits and drawings regarding delivery and construction of the wind turbines.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants' Motion to Compel Arbitration and Dismiss [Docket No.

24] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 7, 2014.